**In re NITEC PAPER CORPORATION, Debtor.**

**No. 84 Civ. 1729(DNE).**

United States District Court, S.D. New York.

Oct. 17, 1984.

Stephen L. Baum, Arthur T. Cambouris, Gerald C. Goldstein and Reina Barcan, New York City, of counsel for appellant Power Authority

LeBoeuf, Lamb, Leiby & MacRae, Thomas G. Rohback, New York City, of counsel for appellant Niagra-Mohawk Power Corp.

Phillips, Nizer, Benjamin, Krim & Ballon, Martin F. Brecker and Jeffrey A. Heller, New York City, of counsel for appellee.*

## OPINION AND ORDER

EDELSTEIN, District Judge:

The New York Power Authority and Niagara-Mohawk Power Corporation ("Niagara-Mohawk") have appealed from an order of the Bankruptcy Court, Burton R. Lifland, J., *In re Nitec Paper Corporation*, 43 B.R. 492, U.S.B.R. (S.D.N.Y.1984), 82 B 10809, ("Order") granting permission to effect transfer of electric power at market rates. The power would normally be used by the debtor-in-possession at below-market, regulated rates. Under the Order it is being transferred to a third party at market price, with the cost difference inuring to the debtor.

Jurisdiction in this case is found: (1) under 28 U.S.C. § 1334, which gives the District Court original jurisdiction over all matters arising under the bankruptcy laws; (2) under 28 U.S.C. § 1331 because this matter involves federal law; and (3) under 16 U.S.C. § 825p, which grants jurisdiction in all disputes arising out of 16 U.S.C. §§ 791a *et seq.*, the Federal Power Act, whose provisions govern the "Niagara Redevelopment Act," 16 U.S.C. §§ 836–836a (1982).

Appellants seek review of the Order. Appellee has moved to dismiss the appeal on the grounds that the Order is not a final order.

## FACTS

A contract existed between the Kimberly Clark Corporation, (appellee Nitec Paper Corporation's ("Nitec") predecessor at its facility) and the Niagara-Mohawk Power Corporation ("Niagara-Mohawk"), a public utility power company. The contract was for the bulk purchase of price-controlled electricity referred to in trade parlance as "replacement power." Appellee Nitec, a debtor in bankruptcy reorganization, sought permission from the bankruptcy court to assume the contract. Nitec filed a proposed order with the U.S. Bankruptcy Court for the Southern District of New York, on January 11, 1984. On January 27, 1984, the bankruptcy court entered the Order calling for Nitec's assumption of the contract.

The Order also called for transfer of about two-thirds of the monthly total in question to a third party, the Occidental Chemical Corporation ("OCC"), for six months. In return, OCC was to pay the controlled price to Niagara-Mohawk while paying Nitec a surcharge of $35,700 per month.

Appellant, Power Authority of New York State ("Power Authority"), is a political subdivision of New York State, and is run as a public benefit corporation. It was originally created in 1931 under the Power Authority Act, L. 1931, ch. 772, codified at N.Y.Pub.Auth. Law §§ 1000–1015 (McKinney 1982 & Supp.1983–84). The Power Authority is responsible for the generation, transmission, and sale of electric power throughout many areas of New York State. It is the regulatory agency supervising the transfer of power at issue here.

Resolution of the issue in this case requires an understanding of the historical relationship among the parties. Appellant

* Wofsey, Certilman, Haft, Lebow & Balin, New York, New York, were substituted as attorneys for the appellee after this appeal was submitted.

Niagara-Mohawk operated two hydro-electric plants known as "Project 16." On June 7, 1956 one of these plants was destroyed in a rock slide. Congress stepped in quickly to help restore the supply of power by passing the "Niagara Redevelopment Act" Pub.L. No. 85–159 (1957) at 16 U.S.C. §§ 836–836a (1982).

Under this Act the Federal Power Commission (since 1977, the Federal Energy Regulatory Commission) was directed to issue a license to the Power Authority to build and operate a replacement facility. Congress specifically mandated, among other conditions, that the Power Authority provide Niagara-Mohawk with an allocation of power equivalent to what was being generated at Project 16 prior to the 1956 disaster. In return for the allocation of power, Niagara-Mohawk voluntarily surrendered its federal license to run the original facility.

Congress indicated its intent in providing power to Niagara-Mohawk: "in order as nearly as possible to restore low power costs to *such industries and for the same general purposes for which power from Project 16 was utilized ....*" 16 U.S.C. § 836(b)(3) (emphasis added).

New York State, by statute, clearly granted regulatory powers to the Power Authority, N.Y.Pub.Auth. Law § 1005(5)(e) and (f). Congress gave this grant force and effect when it mandated that: "[a]s a condition of the license, every licensee hereunder [16 U.S.C. §§ 791a *et seq.*] which is a public service corporation ... owning or operating any project and developing transmitting or distributing power for sale or use in public service, shall abide by such reasonable regulation of the services ... and of rates and charges of payment therefor, as from time to time be prescribed by any duly constituted agency of the state in which the service is rendered or the rate is charged." 16 U.S.C. § 812.

The Power Authority received a copy of the proposed order from Nitec with a request for its endorsement.[1] Pursuant to its regulatory obligation, the Power Authority declined to approve the Order. The bankruptcy court did, however, issue the Order, prompting this appeal.

## THE APPEALABILITY OF THE JANUARY 27 ORDER

■ On the question of appealability of the Order, this court may review any order of the bankruptcy court pursuant to Pub.L. No. 98–353, § 158, 98 Stat. 333, 341 (1984) (codified at 28 U.S.C. § 158), which provides that "the district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of court, from interlocutory orders and decrees, of bankruptcy judges ...." *Id.* This court may treat the notice of appeal, filed with the bankruptcy court, as an application for leave to appeal. *In re Johns-Manville Corp.*, 32 B.R. 728, 731 (S.D.N.Y.1983). Thus, the statute provides the court with discretion in reviewing an interlocutory appeal whether or not it is considered final for purposes of appeal in other instances.

■ Even though the traditional test for finality of orders, *see Cohen v. Beneficial Indust. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), is not required in this case, the same factors are relevant in determining whether or not to accept the appeal under the discretionary jurisdiction to be applied to bankruptcy matters. In this case, many of the factors that favor review of interlocutory orders without this grant of general appellate jurisdiction are present. The subject matter of the order is undeniably final with respect to the appellants. Further, the issues presented on this appeal are certainly separable from the subject matter of the central concern of this action, a Chapter 11 reorganization. *See Cohen v. Beneficial Indust. Loan*

---

1. Federal and State Laws required approval of the "Power Authority" on any "resale" contract. Nitec contends that the contract in question is not a "resale." It contends that in submitting the contract to the Power Authority it was merely following custom in obtaining consent of all interested parties in a bankruptcy action.

*Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949) (test for finality of an order for purposes of appeal). Finally, abstaining from accepting this appeal until the reorganization is finalized will make effective review more difficult. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) ("To come within the 'small class' of decisions exempted from the final judgment rule ..., the order must ... be effectively unreviewable on appeal from a final judgment."). The planned reorganization will be based on the propriety of the resale in question, and the review of the resale should therefore be made before the plan is finalized. If review is delayed until the reorganization plan is in place, any modification may have the potential to upset the entire plan. Therefore, the court accepts the appeal of the order pursuant to the authority granted in 28 U.S.C. § 158, *See In re Johns-Manville Corp.*, 32 B.R. 728, 731 (S.D.N.Y.1983) (leave to appeal "should be liberally granted where it can help the expeditious resolution of the case"), and the appellee's motion to dismiss is denied.[2]

### VALIDITY OF THE JANUARY 27 ORDER

A review of the Order shows the bankruptcy court relied on 11 U.S.C. § 365(a) for its approval of Nitec's assumption of its predecessor's contract, which is not in dispute. No authority, however, is cited for ordering the resale. Thus, the order of resale falls under the bankruptcy court's general authority to manage the estate. 11 U.S.C. §§ 105, 363. Appellee contends this authority is sufficient because there is no specific bar in the bankruptcy code that would invalidate the order. The reallocation, however, is in violation of federal and state law regulating power in the Niagara

frontier region; it is certainly contrary to state and federal laws absent Power Authority approval; and it is contrary to the bankruptcy code itself.

### A. *Federal Law Regulating Power Distribution*

When Congress passed the Niagara Redevelopment Act it certainly did not envision the resale of low cost power as a method to finance a Chapter 11 debtor. Such a scheme by a bankruptcy court becomes in reality quasi-government financial support. It may support the federal policy, expressed in the bankruptcy code, of encouraging the rehabilitation of bankrupt companies, but it does so here by infusing into the estate money to which the estate is not entitled. Such a subsidy is something Congress clearly could have provided for in the Niagara Redevelopment Act, if it intended to do so. On the contrary, the Act indicates Congress intended *not* to furnish a tradeable commodity to companies in the Niagara market, but merely to restore their power on terms existing before the disaster.

Congress made clear that the power allocated to Niagara-Mohawk was "for resale generally to the industries which purchased power produced by project 16 prior to such date, or their successors, in order as nearly as possible to restore low power costs to such industries and for the same general purposes for which power from project 16 was utilized." 16 U.S.C. § 836(b)(3). The Supreme Court has reaffirmed this express statutory language noting that "[replacement power was allocated in order to] 'restore low power costs to,' the customers of its [Project 16] plant." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 104 n. 8, 80 S.Ct. 543, 547 n. 8, 4 L.Ed.2d 584 (1960).

---

**2.** There is also a question whether the issues raised on this appeal are moot. Despite the expiration of the original six month order, the question of the money already paid, and its rightful ownership will remain a live issue. In fact, a review of the transcripts of the January 27 proceedings clearly indicates that the bankruptcy court did not bar an extension, it merely

specified that any such renewal "application will be a de novo application ... not based upon the specific facts ... taken into account [in granting the Order]." Transcript of Nitec Bankruptcy Court Proceedings January 27, 1984 at Page 40. The question raised on appeal, therefore, is not moot.

The Order, therefore, with or without Power Authority approval is contrary to the purpose of the Niagara Redevelopment Act.

### B. Requirement of Power Authority Approval

Certainly court ordered reallocation, *without Power Authority approval,* is not possible. The Power Authority's role was described clearly by Congress: "In the event project power is sold to any purchaser for resale, contracts for such sale shall include adequate provisions for establishing resale rates to be approved by the licensee [Power Authority]." 16 U.S.C. § 836(b)(5).

Federal courts have long held that the "authority to set rates is a proper legislative delegation of power, and so long as the authority acts within what has been delegated to it, it is beyond judicial review." *Virgin Islands Hotel Ass'n v. Virgin Islands Water and Power Auth.,* 54 F.R.D. 377 (D.V.I.1972), *remanded on other grounds,* 465 F.2d 1272 (3d Cir.1972), *appeal after remand,* 476 F.2d 1263, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973).[3] *See also Blum v. Bacon,* 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); *Commonwealth Edison Co. v. Allis Chalmers Mfg. Co.,* 207 F.Supp. 252 (N.D.Ill.1962), *aff'd,* 315 F.2d 564 (7th Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed.2d 64 (1963).

The Power Authority has construed the relevant statutes as requiring its approval of the Nitec-OCC contract. The Power Authority is an administrative agency with technical expertise in the field and long experience interpreting these provisions. In such circumstances, "to uphold [the agency's interpretation] '[the court] need not find that [its] construction is the only reasonable one, or even that it is the result

[it] would have reached had the question arisen in the first instance in judicial proceedings.' ... [The court] need only conclude that it is a reasonable interpretation of the relevant provisions." *Aluminum Company of America v. Central Lincoln Peoples Utility District et al.,* — U.S. —, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984), *quoting Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). *See also Power Auth. of the State of New York v. Federal Energy Regulatory Comm'n,* 743 F.2d 93 at 103 (2d Cir.1984), which accords substantial deference to the FERC, the federal agency supervising power allocation. Here, in the absence of any ruling by the FERC, the decision of the Power Authority is the administrative decision of record.

Furthermore, this court agrees that the Power Authority has the power of review over the validity of the OCC-Nitec agreement. Congress must have intended a case by case evaluation of each request for reallocation by the Power Authority in its role of supervising the Niagara Redevelopment Act. Otherwise Congress would not have called for Power Authority approval as a requirement on all resale contracts.

This interpretation was echoed by the New York State Legislature, which specifically charged the Power Authority with the responsibility to set and adjust rates, N.Y. Pub.Auth. Law § 1005(5)(e) and (f), and also specifically mandated that any resale: "shall be made at rates no higher than those at which the power was purchased from the authority." N.Y.Pub.Auth. Law § 1005(5)(g).

New York courts have clearly upheld the right of the Power Authority to control the allocation and use of other power from the same project within the terms of its federal license.[4] Exceptions have been allowed to

---

**3.** It is noteworthy that in remanding, the court reaffirmed the fact that rate adjustment "is a matter committed to [the Power Authority's] discretion by law and is not subject to judicial review except where the authority has ignored a plain statutory duty, exceeded its jurisdiction or

committed constitutional error." *Virgin Islands, supra,* 465 F.2d at 1273.

**4.** In *Village of Solvay v. Power Authority of the State of New York,* 41 A.D.2d 892, 342 N.Y.S.2d 747 (4th Dept.1973), the Power Authority refused to increase an allotment of power for a

the general purposes outlined for "replacement power," but always with Power Authority approval. *Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp., et al.,* 76 A.D.2d 68, 430 N.Y.S.2d 179, 185 (4th Dept.1980).

Appellee attempts to portray its actions as an allocation of power, which it claims, it is not "reselling" for $35,000 per month, and for which it need not obtain approval. This camouflage of terminology can not conceal what in fact is happening here.

Appellee's contention rests on the reasoning that it has honored the statutory mandate not to resell for profit without Power Authority approval merely because OCC is paying the same utility rate to Niagara-Mohawk as Nitec continues to pay on the portion of the contract it is using itself.[5] Appellee would have this court believe it is receiving the extra $35,000 per month from OCC for some reason totally unrelated to the case at hand, but has utterly failed to explain why this is so. The court can discern no essential difference between an "allocation for profit," as appellee portrays the Order, and a "resale" for the same profit, which the statute bars.

The court finds that Nitec is reselling power. Such a resale may not be made without Power Authority approval, even by a bankruptcy court order.

## C. *Bankruptcy Code*

The Order is in violation of several provisions of the bankruptcy code itself. Under the bankruptcy code, the resale contract between appellee and OCC must be voided by the court if the underlying contract is unassignable because: "applicable law excuses a party, other than the debtor, to such contract or lease from … rendering performance to … an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights …." 11 U.S.C. § 365(c)(1)(A). In this case, Niagara-Mohawk, which is a party to the contract as the supplier of the power, is excused from the assignment by applicable federal and state law, regulating the "replacement power" distribution, at least until the assignment has the approval of the Power Authority.

Appellee's contention that 11 U.S.C. § 365(c) applies only to personal service contracts, though having some support in case law, is essentially incorrect. The language of 11 U.S.C. § 365(c) gives no indication that its scope is limited to personal service contracts. Courts have interpreted this language to mean that Congress did not intend to limit § 365(c) in this manner: "Surely if Congress had intended to limit § 365(c) specifically to personal service contracts, its members could have conceived of a more precise term than 'applicable law' to convey that meaning." *In re Braniff Airways, Inc.,* 700 F.2d 935, 943 (5th Cir.), *rehearing denied* 705 F.2d 450 (5th Cir. 1983). *See also Matter of Varisco,* 16 B.R. 634 (M.D.Fla.1981); *In re Taylor Mf'g.,* 6 B.R. 370 (Bank.N.D.Ga.1980).

In the cases cited by Nitec where § 365(c) has been held not to bar the assignment of a contract, the courts have not construed § 365(c) as being limited to personal service contracts. Instead they have emphasized that § 365(c) bars assignment where the duty involved was non-delegable, or where there existed a "special relation-

---

municipality that wanted it used for a new industrial customer. The company in question was already purchasing power from Niagara-Mohawk directly, and the court stated: "The Authority is under no obligation to give priority to a public body unless the giving of such priority will result in the increased availability of low cost electric power to people as consumers and particularly domestic and rural consumers." *Solvay, supra,* 342 N.Y.S.2d at 749. *See also Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. at 104 n. 8, 80 S.Ct. at 547 n. 8.

**5.** Apparently appellee's counsel also had some difficulty at the onset in maintaining this position as evidenced by the following exchange from the January 20 proceedings:

THE COURT: And you are not selling it [replacement power].

MR. BRECKER: "I couldn't look you in the eye and say I am not selling 10,000 kilowatts. I can't do that. Maybe if I could walk around." Transcript of Nitec Bankruptcy Proceedings January 20, 1984 at page 25.

ship between the parties." *In re Pioneer Ford Sales, Inc.*, 30 B.R. 458, 459 (D.R.I. 1983).

Here, the duty is non-delegable by statutory command. Niagara-Mohawk is the only utility in New York State entitled to "replacement power" under the terms of the Niagara Redevelopment Act.[6] No other utility may sell it, and Niagara-Mohawk may do so only within the terms of the statute as reflected in its agreement with the Power Authority. Thus the right to receive "replacement power" and the duty to pay for it are certainly nondelegable. Even under Nitec's interpretation of § 365(c), therefore, that section would bar the Order.

█ Furthermore, even if § 365(c) is inapplicable to the Order, the Order would still have to be vacated based on other provisions of the bankruptcy code. A contract assumed in bankruptcy is accompanied by all its provisions, and conditions. It may not be assumed in part and rejected in part. "[T]he trustee takes the property of the bankrupt ... in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt...." *Hurley v. Atchinson, Topeka & Santa Fe Railway*, 213 U.S. 126, 133, 29 S.Ct. 466, 468, 53 L.Ed. 729 (1908). *See also Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); *In re Nashville White Trucks*, 5 B.R. 112 (M.D.Tenn.1980); *In re Flores*, 32 B.R. 455 (S.D.Tex.1983); *In re City Stores Company*, 21 B.R. 809 (S.D.N.Y.1982); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y.1982), *aff'd*, 34 B.R. 385 (S.D.N.Y.1983); *In re Klaber Bros., Inc.*, 173 F.Supp. 83 (S.D.N.Y.1959). Thus Nitec could not assume the 1963 Kimberly Clark power contract without also assuming the provision barring any resale that did not have Power Authority approval.

█ In a final defense of the Order, appellee contends that the court is obligated to consider the "tension" between 11 U.S.C. § 365(c) and 11 U.S.C. § 365(f). While subsection (c) bars the trustee from assigning an executory contract if applicable law excuses a party, subsection (f) provides: "Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract ... or applicable law, that prohibits ... the assignment ... the trustee may assign such contract ...." 11 U.S.C. § 365(f).

Appellee misinterprets subsection (f). That subsection allows a trustee to assign a contract even when the contract bars such an assignment, and even if "applicable law" in the state gives legal force to contractual provisions barring assignment. It does not allow a trustee to assign a contract in violation of a specific federal or state statutory mandate forbidding such an assignment. Here, the relevant statutes call for Power Authority approval; these directives may not be circumvented under subsection (f).

The court in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.), *rehearing denied*, 705 F.2d 450 (5th Cir.1983), for example, held that the bankruptcy court could not force the FAA to approve the debtor's assignment of its contractual right to airport landing slots contrary to applicable regulations. Despite its detailed analysis and extensive research, *id.* at 943, the court barred the assignment without even mentioning subsection (f). Appellee alleges that the regulatory considerations of the FAA, "[s]afety, efficiency, national defense, and the regulatory environment are [in the case of the Power Authority] irrelevant." Appellee brief, page 19. The court finds otherwise.

When considering passage of the Niagara Redevelopment Act, Congress found that "The operations of huge concentrations of ... industries at Niagara Falls depend in substantial part upon this [electric power] capacity. These operations constitute the principal sources of employment on the Niagara frontier and comprise the heart of the economy of the area. *They*

---

6. *See Tuscarora Indian Nation, supra,* 326 U.S. at 104 n. 8, 80 S.Ct. at 547 n. 8.

*are vital to the national defense.*" H.R. Rep. No. 862, 85th Cong., 2d Sess., 1957 U.S. Code Cong. & Ad. News 1585, 1587 (emphasis added). Hence, the allocation of power involves similar important policy considerations. As the court in *Braniff* held, they may not be subverted by the bankruptcy proceeding.

The entire bankruptcy code creates a scheme consistent with this interpretation. A reorganization must be formulated within the bounds of existing state and federal law.[7] Under 28 U.S.C. § 959 a debtor in possession: "shall manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated ...." 28 U.S.C. § 959(b).[8]

Congress specifically manifested an intent for state law to govern significant areas of the electrical power market regulation in the Federal Power Act where it noted, although "selling electric energy for ultimate distribution to the public is affected with a public interest ... such Federal regulation ... extend[s] only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a).[9]

In this case there are statutory standards to be applied by the Power Authority in allocating replacement power. It is not for the bankruptcy court or for this court to waive compliance with those standards. Application of those standards is for the appropriate regulatory agency in the first instance, and for the courts to review for abuse of discretion on appeal. The provisions of the bankruptcy code clearly envision respect for these fundamental procedures.

Although many companies have attempted to use the bankruptcy law to circumvent important state and federal policies,[10] this court cannot allow it to happen.

### D. *Summary*

Under either The Niagara Redevelopment Act, The Federal Power Act, the bankruptcy code, or state law, recognized by the code, the order of the bankruptcy court must be vacated.

The court's holding here relates strictly to the validity of the January 27 order, and in no way touches on any other element of the *Nitec* Chapter 11 action. Disputes over the status of the funds paid out are best

---

7. The Supreme Court has indicated several situations where the bankruptcy code must bend in the face of contrary federal policy. *See, e.g., N.L.R.B. v. Bildisco,* —— U.S. ——, ——, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) (National Labor Relations Act policy endorsing union contracts). The Supreme Court has also held that even if it is "impossible in the circumstances for the receiver [to comply with] the state law, this is not an excuse for operating the business in disregard of that law...." *Gillis, Receiver v. California,* 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934).

8. For example, there is clear precedent that "in determining whether a contract is ... assumable [by a debtor] ... state law as well as federal bankruptcy law must be applied." *In re Alithochrome Corp.,* 28 B.R. 311 (S.D.N.Y.1983). *See also In re Fountainbleau Hotel Corp.,* 515 F.2d 913 (5th Cir.1975); *In re New England Carpet Co.,* 18 B.R. 514 (D.Vt.1982); *Executive Square Office Building v. O'Connor & Associates,* 19 B.R. 143 (N.D.Fla.1981); *In re Flannery,* 11 B.R. 974 (E.D.Pa.1981); *In re Bronx-Westchester Mack Corp.,* 4 B.R. 730 (S.D.N.Y.1980); *In re Flores,* 32 B.R. 455 (S.D.Tex.1983).
   The application of this principle to this case is clear. The bankruptcy court must give great

weight to the laws of the state in which it sits. Yet nothing from the record below shows how the court reconciled its order with NY Pub. Auth. Law § 1005.

9. New York courts have traditionally invoked their jurisdiction over disputes arising from management of Niagara-Mohawk's "replacement power" despite the valid argument for making all such disputes a matter of federal jurisdiction. *See, Airco Alloys Division, Inc. v. Niagara Mohawk Power Corporation, and Power Authority of the State of New York,* 65 App.Div. 378, 411 N.Y.S.2d 460 (1978 4th Dept.).

10. *See, e.g., In re Quanta Resources Corp., Debtor,* 739 F.2d 927 (3d Cir.1984) (state toxic waste regulation); *Matter of Canarico Quarries, Inc., Debtor,* 466 F.Supp. 1333, 1337–40 (D.P.R.1979) (Clean Air Act regulation); *Department of Housing Preservation and Development v. Lewis Nicolas & Co., Inc.,* 83 Civ. 8106 (DNE) (unpublished order) (S.D.N.Y. May 29, 1984) (municipal housing regulation); *Cf. Commodity Futures Trading Comm. v. Incomco, Inc.,* 649 F.2d 128 (2d Cir. 1981) (commodities trading regulation).

resolved in the first instance by the bankruptcy court.

## CONCLUSION

Appellee's motion to dismiss the appeal before a submission on the merits is denied in all respects. The order of the bankruptcy court of January 27, 1984, Burton R. Lifland, J., 82B 10809 is vacated, and the case is remanded for further proceedings consistent with this opinion. This action is dismissed.

SO ORDERED.