WAYNE H. COLONEY COMPANY, INC., a Florida corporation, Plaintiff,

v.

The UNITED STATES of America, the DEPARTMENT OF the AIR FORCE, and Edward Aldridge as Secretary of the Dept. of the Air Force, Defendants.

Bankruptcy Nos. 86–9020, 82–07082.

United States Bankruptcy Court, N.D. Florida, Tallahassee Division.

Aug. 8, 1988.

James H. Post, Jacksonville, Fla., for plaintiff.

Lyndia Barrett, Asst. U.S. Atty., Tallahassee, Fla., and LTC Lawrence R. Metsch, U.S.A.F.R., Miami, Fla., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS M. KILLIAN, Jr.,
Bankruptcy Judge.

On March 12, 1986, Wayne H. Coloney Company, Inc. ("Coloney") filed a complaint to (1) determine the dischargeability of a debt asserted against Coloney by the United States of America, Department of the Air Force (the "Air Force") and (2) obtain a declaratory judgment and other equitable relief. Coloney filed a petition under Chapter 11 of the Bankruptcy Code on August 13, 1982, a plan of reorganization was thereafter confirmed on May 23, 1983, and the case was closed by a Final Decree entered by this Court on April 24, 1985. The case was reopened on December 2, 1985, to allow the filing of this action.

Prior to the filing of its Chapter 11 case, a substantial portion of Coloney's income had been derived from work performed pursuant to contracts with the United States government and in particular with the Air Force. On July 10, 1985, the Air Force informed Coloney that, in accordance with the price redetermination provisions of one such contract, the Defense Contract Audit Agency (DCAA) had issued its Advisory Report to Establish a Final Price on Fixed Price Incentive Contract F33657–77–C–0451 (the "Final Advisory Report") wherein it had concluded that the Air Force had over paid Coloney the sum of $1,520,-534.00 (the "Air Force Claim"). Coloney asserts that the AF Claim is based upon a contract that was completed pre-petition, that the contract was not executory and was not assumed by Coloney in its plan of reorganization, and that any debt to the Air Force based upon that contract was discharged by confirmation of its plan pursuant to 11 U.S.C. § 1141. The Air Force, on the other hand, asserts that the debt was not a claim against the estate and thus not subject to discharge. The Air Force further maintains that, even if a claim did exist prior to confirmation, the contract was executory and was assumed in Coloney's plan; therefore, Coloney remains bound by all of its terms including those dealing with redetermination of the contract price.

This is a proceeding arising under Title 11, and the Court has determined that it has jurisdiction over this matter under 28 U.S.C. § 1334(b). The issues raised in this case involve Title 11 questions of law; therefore, pursuant to 28 U.S.C. § 157(b)(3), the Court has determined that this is a core proceeding under 28 U.S.C. § 157(b)(2). Having considered the evidence and argument of counsel, the Court makes the following findings of fact and conclusions of law:

On October 18, 1977, Coloney and the Air Force entered into a contract, designated by Procurement Instrument Identification Number (PIIN) F33657–77–C–0451 and referred to as the "0451 Incentive Price Contract," by which Coloney was to design, manufacture and deliver to the Air Force:

(1) 48 ammunition loaders, (2) 36 auxiliary power units to be used in connection with the ammunition loaders, (3) ammunition containers, (4) spare parts from the date of delivery until 120 days after final delivery of the ammunition loaders, and (5) engineering and technical data to assist the Air Force in using the ammunition loaders. The Air Force subsequently exercised its options under the 0451 Incentive Price Contract to take delivery of an additional 48 ammunition loaders. The price terms of the contract called for payment of Coloney's cost plus a profit.[1] Pursuant to the terms of the contract, the final amount paid to Coloney was subject to redetermination upon completion of the contract.

Upon completion of its obligations under the 0451 Incentive Price Contract, Coloney was required to submit a report to the Air Force setting forth all costs incurred by Coloney in performing its obligations under the contract (the "Price Redetermination Proposal") and to deliver to the Air Force all government inventory remaining in Coloney's possession relating to the contract. Coloney made its last delivery under the 0451 Incentive Price Contract on April 22, 1982, submitted its Price Redetermination Proposal, and returned the government inventory to the Air Force. On June 6, 1982, two months prior to the filing of Coloney's Chapter 11 petition, the Air Force made its final payment on the 0451 Incentive Price Contract bringing the total price actually paid by the Air Force to Coloney to $25,131,711. On May 19, 1983, four (4) days prior to confirmation of Coloney's plan, the DCAA issued the Final Advisory Report to the Air Force, in which the DCAA concluded that the Air Force should not have reimbursed Coloney for $1,520,534 of the costs incurred under the 0451 Incentive Price Contract. The Final Advisory Report was the result of the DCAA's audit of the costs incurred under the 0451 Incentive Price Contract, which audit began in April, 1980

(pre-petition), and was completed in March, 1983 (pre-confirmation). Both the Air Force contracting officers and several employees at Coloney were aware before the audit was complete that there may be questions concerning some of the cost items; however, Coloney was not informed of the existence of the Final Advisory Report or its contents until a meeting held on July 10, 1985, at Coloney's offices.

The Air Force filed two proofs of claim during the pendency of the Coloney case. The first, claim number 200 filed on October 27, 1982, in the amount of $4,702,165.10, was for unliquidated progress payments made to Coloney on various contracts which Coloney claimed it was continuing to perform. Claim 200 listed an amount due of $763,127.93 based on unliquidated progress payments associated generally with the 0451 Contract including all of its related changes, modifications, and supplemental agreements. That claim was eventually disallowed by order of this Court on June 28, 1983. The second claim, claim number 332 in the amount of $457,056.36, was filed on September 19, 1984, one year and four months after issuance of the DCAA Final Advisory Report and confirmation of Coloney's plan. It too was based upon unliquidated progress payments, $454,251.06 of which were attributable to the 0451 Contract and its related changes, modifications, and supplemental agreements. Neither claim made any reference to or asserted any part of the $1,520,534 Air Force Claim which is the subject of this case.

On September 27, 1979, Coloney entered into another contract with the Air Force, designated by the PIIN F33657–79–C–0806–PZ0001 and referred to as the "0806 Fixed Price Contract", by which Coloney was to (1) manufacture an additional 112 ammunition loaders, and (2) deliver engineering and technical data to assist the Air

---

**1.** Coloney received periodic payments from the Air Force as work was completed. The terms of the contract called for Coloney to invoice the Air Force for its costs every two weeks and the Air Force would then reimburse Coloney every two weeks for 85% of the costs incurred. The other 15% of the cost and the profit were paid

periodically upon completion of various phases of the 0451 Incentive Price Contract. A more detailed description of the entire incentive price mechanism is found in *Lockheed Aircraft Corporation v. United States*, 179 Ct.Cl. 545, 375 F.2d 786 (1967).

Force in using the ammunition loaders. The ammunition loaders produced under this contract were substantially similar to those produced under the 0451 Incentive Price Contract.

During the term of the 0451 Incentive Price Contract and subsequent to its completion, Coloney and the Air Force entered into various "supplemental agreements" or "contract modifications" to the 0451 Incentive Price Contract. The following five such agreements are material to this adversary proceeding:

1) On October 15, 1980, Coloney and the Air Force entered into a supplemental agreement, designated as F33657–77–C–0451–PKOOO3 (PK0003), by which Coloney was to design, manufacture, and deliver to the Air Force 12 Rounds Return Units which would facilitate the regular operational checks of the ammunition loaders produced under the 0451 Incentive Price Contract and the 0806 Fixed Price Contract. This agreement was for a fixed priced of $93,250, which was not subject to redetermination.

2) On March 2, 1981, Coloney entered into a supplemental agreement with the Air Force, designated as F33657–77–C–0451–P00071 (P00071) by which Coloney was to design, manufacture, and deliver certain quantities of a control lever assembly to replace the existing control lever assembly on the ammunition loaders which Coloney had or would manufacture under the 0451 Incentive Price Contract and the 0806 Fixed Price Contract. This agreement was for a fixed price of $13,500, which was not subject to redetermination.

3) On June 2, 1981, Coloney entered into a supplemental agreement with the Air Force, designated as F33657–77–C–0451–P00072 (P00072) by which Coloney was to replace an aluminum drum on the first 47 ammunition loaders delivered to the Air Force with a hard coated drum which had already been placed on the final 145 ammunition loaders delivered to the Air Force. This agreement was for a fixed price of $583,000, which was not subject to redetermination.

4) On November 22, 1981, Coloney and the Air Force entered into a supplemental agreement, designated as F33657–77–C–0451–P00080 (P00080) by which Coloney was to recycle a certain quantity of ammunition containers used in connection with the ammunition loaders produced under the 0451 Incentive Price Contract and the 0806 Fixed Price Contract. This agreement was for a fixed price of $485,540 which was not subject to redetermination.

5) On January 11, 1982, Coloney entered into a supplemental agreement with the Air Force, designated as F33657–77–C–0451–PK0006 (PK0006) by which Coloney was to design, manufacture, and deliver a machine which would inspect and repackage all ammunition used in the ammunition loaders delivered under the 0451 Incentive Price Contract and the 0806 Fixed Price Contract. This agreement was for a fixed price of $514,830 which was not subject to redetermination.

The cover page of each of the five supplemental agreements was an AFSC Form 702 entitled "Amendment of Solicitation/Modification of Contract." The Procurement Instrument Identification Number of each agreement, shown in block 2, was F33657–77–C–0451, the identification number of the 0451 Incentive Price Contract. The parties generally referred to the supplemental agreements by their Supplemental Procurement Instrument Identification Number (SPIIN), found in block 3, which begins with either a "P" or "PK" prefix. Block 14 of Form 702 appears as follows:

14. This Block Applies Only To Modifications Of Contracts [as opposed to Amendments of Solicitations dealt with in Block 13]

[ ] This Change Is Issued Pursuant To ____ The Changes Set Forth Herein Are Made To The Above Numbered Contract/Order.

[ ] The Above Numbered Contract Is Modified To Reflect The Administrative Changes (Such As Changes In Paying Office, Appropriation Data, Eyc.) Set Forth Herein.

[ ] This Supplemental Agreement Is Entered Into Pursuant To Authority Of _____ It Modifies The Above Numbered Contract As Set Forth Herein.

[ ] This Modification Is Issued Pursuant To _____.

The third block on each form was "X"ed and completed with the appropriate authority—either Contract Line Item Number (CLIN) 0008 or the "Changes Clause" of the 0451 Incentive Price Contract.

Each item of work to be performed by Coloney was identified in the 0451 Incentive Price Contract by a Contract Line Item Number. Because neither the Air Force nor Coloney knew at the inception what kind or how much support equipment would ultimately be required, CLIN 0008 was left blank or "reserved" for future procurement of related support equipment once the needs of the Air Force were determined at a later date. PK0003 and PK0006 were agreements for the design and manufacture of support equipment for the ammunition loaders manufactured under both the 0451 Incentive Price Contract and the 0806 FPC and were, therefore, authorized by CLIN 0008. P00071, P00072, and P00080 were authorized by the Changes Clause found in Section L, Clause 2 of the 0451 Incentive Price Contract which incorporates the provisions of Armed Services Procurement Regulation (ASPR) 7–103.2 which states as follows:

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such changes causes an increase or decrease in the cost of, or the time required for the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change, *provided,* however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor's claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes". However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

At the time Coloney entered into the 0451 Incentive Price Contract, there had been no identification of the work to be done under any of the five supplemental agreements. The 0451 Incentive Price Contract contained no terms for quality, quantity, price, or delivery of the items delivered under the five supplemental agreements. The terms of each agreement were separately negotiated, and each agreement was executed by the contracting officers of both the Air Force and Coloney. On August 13, 1982, the date that Coloney filed its Chapter 11 petition, neither party had completed its obligations under any of the five supplemental agreements.

Coloney's Chapter 11 plan (the "Plan") made specific provisions for the assumption and rejection of contracts. Articles 8.01 and 8.02 of the Plan provided as follows:

8.01 *Assumption of Certain Executory Contracts.* Debtor hereby assumes, pursuant to section 1123(b)(2) of the Code, the executory contracts set forth on Exhibit A attached hereto.

8.02 *Rejection of Certain Executory Contracts.* Debtor hereby rejects, pursuant to section 1123(b)(2) of the Code, the executory contracts set forth on Ex-

hibit B attached hereto and any other executory contract not specifically identified in Exhibit A of Section 8.01 above.

Exhibit "A" to the Plan was an extensive listing of contracts which included numerous government procurement contracts under the sub-title *"CUSTOMER CONTRACT SUMMARY."* The summary listed the following pertinent items:

| Contract No. | Description | Contract Amount |
|---|---|---|
| F33657–77–C–0451 | Contract Modification and Change Orders | |
| PK0003 | Rounds Return Unit | 93,250.00 |
| PK0006 | Processing Inspec. Assembly | 514,830.00 |
| P00071 | Reroute Control Cable | 13,500.00 |
| P00072 | Drum Retrofit Kits | 583,000.00 |
| P00080 | Container Recycle | 485,540.00 |

Exhibit "B" made no reference to the 0451 Incentive Price Contract. In fact, there were no other references to either the 0451 Incentive Price Contract or to any of the supplemental agreements in the Plan. A confirmation hearing was held on May 16, 1983. The Plan was accepted by an overwhelming majority of the creditors who voted in each class, both in number and amount, and on May 23, 1983, the Court entered its order confirming the Plan. The Air Force did not object to confirmation of the Plan, nor did it vote on the Plan or participate at the confirmation hearing.

### CONCLUSIONS OF LAW

A. *The AF Claim constitutes a claim as defined in § 101(4) of the Code.*

█ The Air Force contends that the AF Claim is not a claim under § 101(4), and therefore not discharged under 11 U.S.C. § 1141(d)(1), because the Air Force's contracting officer had not finally determined the validity or amount of its claim under the 0451 Incentive Price Contract as of the date of confirmation of Coloney's Plan. Section 1141(d)(1) of the Bankruptcy Code provides in pertinent part that:

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of confirmation ... whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan....

Section 101(11) defines "debt" to mean a "liability on a claim," and section 101(4) defines a claim to mean a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgement, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

The legislative history of section 101(4) states that:

... The definition in paragraph (4) adopts an even broader definition of claim than is found in the present [pre-Code] debtor rehabilitation chapters. The definition is any right to payment, whether or not reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.... By this *broadest possible definition,* and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court. (emphasis added).

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. A "claim" or "right to payment" under a written agreement arises when the agreement is executed regardless of whether the right to payment is contingent, disputed, unliquidated, or not present-

ly payable. *In re Peltz*, 55 B.R. 336, 338 (Bankr.M.D.Fla.1985); *Kallen v. Litas*, 47 B.R. 977, 983 (N.D.Ill.E.D.1985); *In re Briggs Transportation Company*, 37 B.R. 76, 79 (Bankr.Minn.1984).

The 0451 Incentive Price Contract was executed on October 18, 1977. Both Coloney and the Air Force had completed their obligations under the 0451 Incentive Price Contract, including payment of all sums due to Coloney, prior to August 13, 1982, the date of Coloney's petition. The only detail that remained to be completed as a part of the Air Force's administrative closing out of the contract was the price redetermination process including the DCAA audit which, though not a final determination, would establish the claimed amount of any non-allocable or questionable cost. In *In re Remington Rand Corp.*, 836 F.2d 825 (3rd Cir.1988), the Third Circuit held that the fact that the government had not established the "precise amount of its claim" was immaterial to whether or not it had a claim under 11 U.S.C. § 101(4). In *Remington Rand*, the General Services Administration (GSA) and Remington Rand had entered into several pre-petition contracts for the supply of typewriters to the government. These contracts included a "most favored nation" clause that guaranteed that the government would get the lowest price that Remington Rand charged to any other customer. Soon after Remington Rand filed its Chapter 11 petition, the government began an audit of the GSA contracts which revealed that there were breaches of the "most favored nation clause." The audit was completed and the results released to GSA over five months prior to confirmation of Remington Rand's plan, although the amount owed to GSA, $394,773, was not determined until after another audit which was not released until after confirmation. The Court's holding that GSA's claim arose pre-confirmation was premised upon the fact that the "government knew it possessed the right to payment for breach of contract before" confirmation. The Court stated that:

> In most cases, we anticipate that the government will not possess sufficient knowledge to assert a potential claim

until completion of a post-award audit. Only then would the parties' "legal relationship," *see Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 943 (3d Cir.), *cert. denied sub nom., Reading Co. v. Schweitzer*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), be such that the government would be in a position to determine and assert its right to payment. Indeed, the post-award audit is expressly designed to ascertain possible contract breaches. Therefore, the government's bankruptcy claim would likely not arise until that time.

*Id.* at 833 n. 7. By that rationale, the AF Claim in this case would certainly arise pre-confirmation. Clearly, the Air Force knew it had a right to payment and could have asserted its right to payment before confirmation of Coloney's Plan.

Although this Court arrives at the same conclusion reached by the Third Circuit in the *Remington Rand* case, it does not agree with the "knowledge" test applied to determine the date upon which a claim arises. The "legal relationship" which establishes the Air Force's right to payment in this case is the 0451 Incentive Price Contract, irrespective of any actual knowledge the Air Force may or may not have had of any specific over-payments it was entitled to recover under the contract's redetermination provisions. Of course, the redetermination provisions of the contract did not come into play until after the contract had been otherwise completed; therefore, it might be argued that the Air Force's right to recover any over-payments did not arise until after the last payments were made to Coloney, but even that event occurred pre-petition. Accordingly, the Court concludes that the Air Force's right to payment arose on the date the 0451 Incentive Price Contract was executed or, at the very latest, on the date the last payment was made to Coloney under the contract. Having concluded that the AF claim arose prior to the date of confirmation of Coloney's Plan on May 23, 1983, unless it was otherwise provided for in the Plan or in the order confirming the Plan,

the AF claim was discharged upon confirmation.

### B. *Coloney's Chapter 11 Plan Expressly Assumes Only the Five Supplemental Agreements.*

The Air Force contends that, if the AF Claim is a "claim" under § 101(4), it has not been discharged because Coloney expressly assumed the 0451 Incentive Price Contract in its Chapter 11 Plan. This argument is not supported by the evidence. The specific language of Coloney's Chapter 11 plan provides only for the assumption of the five supplemental agreements. A description of the 0451 Incentive Price Contract and the contract amount of $25,131,-711 does not appear in Exhibit "A" along with the other contracts to be assumed. The only reference to the 0451 Incentive Price Contract is the appearance of the PIIN "F33657–77–C–0451" itself which appears in Exhibit "A" only as a prefix to identify the five "Contract Modification and Change Orders" (supplemental agreements) which are listed under it. Given the context in which the 0451 PIIN appears in the Plan, there is absolutely no way to interpret the Plan as having expressly assumed the 0451 Incentive Price Contract. If anything, the 0451 Incentive Price Contract was rejected pursuant to Article 8.02 of the Plan.

### C. *The 0451 Incentive Price Contract and the five supplemental agreements were intended to be, and were separate contracts.*

■ The Air Force maintains, nevertheless, that there was only one contract, that the five supplemental agreements were simply contract modifications—not separate contracts, and that the contract was executory because neither party had fulfilled its obligations thereunder. The Air Force further contends that Coloney could not have assumed only part of the contract and that by reference to the five supplemental agreements, Coloney assumed the entire contract. Coloney, of course, disagrees with the Air Force's characterization of their agreement or agreements as a single contract. In Coloney's view, the 0451 Incentive Price Contract had been fully performed and was therefore no longer an executory contract. Thus, Coloney made no attempt to include the 0451 Incentive Price Contract among the contracts to be assumed pursuant to its plan. Coloney's testimony was that the five supplemental agreements were each separately negotiated contracts, that they were the only contracts assumed, and that Coloney had no intention of assuming the 0451 Incentive Price Contract.

An executory contract has been defined as one, "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance by the other." Countryman, *"Executory Contracts in Bankruptcy: Part I"*, 57 Minn.L.Rev. 439, 460 (1973). The Bankruptcy Code does not provide a definition of an executory contract; however, the legislative history of 11 U.S.C. § 365 states that, "it generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Taken aside from the five supplemental agreements, the 0451 Incentive Price Contract was clearly not executory and not assumable—performance of all obligations had been completed on both sides. In contrast, there remained some performance by both sides on each of the five supplemental agreements. Therefore, the 0451 Incentive Price Contract and the five supplemental agreements, if viewed as a single contract, were both executory and assumable.

Whether or not an agreement should be characterized as a single or several contracts depends upon the intent of the parties which, "absent any ambiguity in the terms of the contract, ... is gleaned from the four corners of the document." *In re Gardinier*, 831 F.2d 974 (11th Cir.1987).[2]

---

**2.** In *Gardinier,* the debtor attempted to assume a contract to sell real estate which contained a

The Eleventh Circuit enumerated three factors that it found were persuasive evidence of intent in determining whether or not the parties in that case had entered into a single or separate contracts: (1) whether the nature and purpose of the agreements are different, (2) whether the consideration for each agreement is separate and distinct, and (3) whether the obligations of each party to the agreements are interrelated. *Id.* at 976. Those same factors are equally applicable and persuasive in this case. There is, however, an additional factor which must be considered in this case: that is, "how did the parties themselves identify the agreements in question?" Applying each of these factors to the instant case, the Court finds that the five supplemental agreements are separate and distinct contracts from the 0451 Incentive Price Contract.

The Court begins by noting that all of the agreements were reduced to writing on government contract forms supplied by the Air Force. In the complex and arcane world of defense procurement contracts, the supplier, in this case Coloney, has little or no input into the terminology used on the forms; it must simply employ those terms which, for whatever reason, the government uses. The Air Force's case, nonetheless, relies extensively on the construction of the terminology used by the parties which, it maintains, is convincing evidence that the five supplemental agreements are nothing more than modifications to the 0451 Incentive Price Contract. The Air Force correctly points out, and Coloney does not disagree, that the five supplemental agreements were consistently referred to by the parties, on the Air Force forms and elsewhere, as "modifications" to the 0451 Incentive Price Contract which were authorized by either the Changes Clause or CLIN 0008 of that contract.

The arguments of both parties rely to some extent on the definitions of "con-tract" and "supplemental agreement" found in the Armed Services Procurement Regulations (1976 Edition) ("ASPR"). Section 1–201.4 defines "contracts" as follows:

Contracts means all types of agreements and orders for the procurement of supplies or services. It includes awards and notices of award; contracts of a fixed-price, cost, cost-plus-a-fixed-fee, or incentive type; contracts providing for the issuance of job orders, task orders or task letters thereunder; letter contracts, and purchase orders. *It also includes supplemental agreements with respect to any of the foregoing.* (emphasis added).

In turn, "supplemental agreement" is defined by Section 1–201.18 of ASPR to mean "any *contract modification* which is accomplished by the mutual actions of the parties." (emphasis added). These definitions are plainly contradictory and, therefore, offer the Court little guidance as to the actual nature of a supplemental agreement, be it a modification or a contact. The *Construction Contract Negotiation Guide* (1988 edition), published by the U.S. Army Corps of Engineers, provides probably the greatest insight. It defines a "supplemental agreement" as:

... *essentially a new negotiated contract* which must be founded upon bilateral agreement of the parties. A supplemental agreement is added as a supplement to an existing contract simply as a matter of administrative convenience. (emphasis added).

This definition seems to portray better than any other what the parties actually intended. Each agreement was a separately negotiated, bilateral agreement which was "added" to the existing 0451 Incentive Price Contract primarily for reasons of administrative convenience.

The element of administrative convenience explains in large measure why supplemental agreements are labeled as "modi-

---

provision obligating the debtor to pay a commission to the real estate broker. The creditor's committee objected to the assumption of the brokerage agreement on the grounds that it was a separate and non-executory agreement. The Court held that even though the two agreements were contained in the same document, the brokerage agreement was a separate and non-executory agreement which could not be assumed. *See also, In re Chemtoy Corp.,* 19 B.R. 475, 481 (Bankr.N.D.Ill.1982).

fications" to contracts. When the Air Force enters into a major contract for the development of a totally new system such as the ammunition loading system, there will invariably be work required which is not contemplated or foreseeable at the outset. Provisions are generally made in the original contract which either authorize or provide the basis for future agreements to perform new work or further system development which would otherwise be outside the scope of the original contract. By tying future work to the original contract, in this case through the use of the Changes Clause and CLIN 0008, the government facilitates the purchase of entire systems from a single contractor without the necessity of obtaining further funding and without the need to go through the time consuming and costly bidding process to obtain system related work. This approach to the problem by the Air Force is sensible, cost effective, and probably necessary if the Air Force is to comply with its own and other government procurement regulations and statutory funding requirements. Still, as Coloney contends, it is the true nature of the documents in question, not the labels or terminology used to identify those documents, which is dispositive of the question of whether they constitute one or more contracts. *Ram Const. Co., Inc. v. American States Ins. Co.*, 749 F.2d 1049 (3rd Cir.1984).

In *Ram Construction*, the debtor had a contract with the City of Pittsburgh, Pennsylvania, for removal of a landslide. When a subsequent landslide occurred, the City requested a proposal from the debtor to do the additional work. New terms were negotiated, but the debtor did not sign a new written contract with the City. Rather, the City issued an "Authorization For Additional Work" utilizing the City Controller's number for the original contract. In holding that the "additional work" constituted a separate contract, the Court stated:

> That the City, for its convenience and for purposes of internal administration, labeled the project as "additional work" was not dispositive of whether there were two contracts or one.

. . . the labels the City used in reaching an agreement with [the debtor] are not dispositive of the legal issue confronting us. It is obvious that City officials are required to utilize a special terminology to comply with ordinances and established departmental directives. Those internal semantic demands, however, cannot mask the essential attributes of the [arrangement between the parties].

*Id.* at 1052, 1054. It appears in this case that the Air Force was guided by the same or similar semantic demands, and the Court is not convinced by the use of the term "modification" to identify the five supplemental agreements that the actual intent of the parties was to create a single contract. Thus, the Court must look beyond the labels and consider the other evidence of intent.

The nature and purpose of the contracts were different. The 0451 Incentive Price Contract was a contract for the design and manufacture of ammunition loaders to be used with the 30 mm cannon on the A–10 aircraft. The five supplemental agreements were for work relating to the ammunition loader system, but they were contracts for either (1) the production of separate items of support equipment which were clearly not within the scope of the 0451 Incentive Price Contract or (2) the design, manufacture, and installation of new parts to be used on the ammunition loaders. In some instances, the five supplemental agreements required Coloney to perform work relating to ammunition loaders which were designed or manufactured pursuant to the totally foreign and unrelated 0806 Fixed Price Contract in addition to those designed and manufactured pursuant to the 0451 Incentive Price Contract.

The consideration for the 0451 Incentive Price Contract was separate and distinct from the consideration for the five supplemental agreements. The Air Force agreed to pay Coloney the following amounts for

work performed pursuant to the Five Supplemental agreements:

| | |
|---|---|
| PK0003 | $ 93,250 |
| PK0006 | 514,830 |
| P00071 | 13,500 |
| P00072 | 583,000 |
| P00080 | 485,540 |

These amounts represent the consideration for only those items delivered under each of the five supplemental agreements respectively. These were fixed amounts which were not subject to redetermination. On the other hand, the price to be paid for the items delivered under the 0451 Incentive Price Contract was subject to redetermination upon completion, the contract had been completed, and the Air Force had made its final payment to Coloney under the 0451 Incentive Price Contract prior to completion of any of the five supplemental agreements.

The obligations of the parties under the 0451 Incentive Price Contract and the five supplemental agreements were not interrelated. The 0451 Incentive Price Contract did not contain terms for price, quality, quantity, or delivery of the goods and services ultimately delivered under the five supplemental agreements, and its performance was not dependant upon any of the terms of those agreements. In fact, all of the obligations of both parties under the 0451 Incentive Price Contract had been fully preformed prior to the filing of Coloney's petition while both parties remained obligated to some extent on each of the supplemental agreements. Although the original agreement contemplated that future work would be required, it should be pointed out that Coloney did not become obligated in any manner to perform until that work was eventually described, the terms negotiated, and the agreements executed. *See, Fincher v. Belk–Sawyer Company*, 127 So.2d 130, 131 (Fla.App., 3d Dist. 1961). Each supplemental agreement was separately negotiated and each included a complete description of the work to be accomplished as well as its own terms for price, quality, quantity, and delivery; consequently, each supplemental agreement was enforceable independant of the 0451 Incentive Price Contract.

Accordingly, based on the foregoing, the Court concludes that the five supplemental agreements are each separate contracts from the 0451 Incentive Price Contract, and they are the only contracts assumed by Coloney in its Plan.

■ Even assuming that the agreements between the parties were construed as a single contract, the Air Force is now prohibited from asserting that Coloney's attempted assumption of only the five supplemental agreements resulted in the assumption of the entire 0451 Incentive Price Contract as well. It is true, as a general proposition, that the debtor can not sever and assume part of a contract and reject the remainder as proposed in Coloney's plan. *Hurley v. Atchison, Topeka & Santa Fe Railway*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir.1985); *In re Nitec Paper Corp.*, 43 B.R. 492 (S.D.N.Y.1984); 2 King, *Collier on Bankruptcy* ¶ 365.03 (15th ed. 1988). However, where a Chapter 11 plan so provides and a final order confirming the plan is entered by the bankruptcy court, the question of whether or not it is impermissible to assume part of a contract is *res judicata* and cannot thereafter be asserted. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987); *But cf. Union Carbide Corp. v. Newboles*, 686 F.2d 593 (7th Cir. 1982) (*Res judicata* was not raised or discussed in this case. The Court held that a provision in a confirmed plan that provided for the release of liability of a third party guarantor was not effective because it was outside of the scope of the Bankruptcy Court's powers to do so.). Again, there can be no misinterpretation of the provisions in Coloney's plan dealing with the assumption and rejection of contracts. The plan provided for the assumption of only the five supplemental agreements. The Air Force did not object to confirmation, the Plan was confirmed, and the Air Force did not appeal the order of confirmation. Therefore, the Air Force is now barred by *res judicata* from asserting that the entire 0451 Incentive Price Contract was assumed.

In summary, the Court concludes that the Air Force had a pre-confirmation claim based on the 0451 Incentive Price Contract which could have been but which was never asserted against Coloney. Coloney did not assume the 0451 Incentive Price Contract in its plan of reorganization—either expressly or indirectly by assumption of the five supplemental agreements which the parties intended to be and which were separate and independent contracts. Moreover, the Air Force was involved in and fully aware of the proceedings in the Coloney Chapter 11 case. It had ample opportunity to object to its treatment in the plan at the confirmation hearing and did not do so. The Air Force Claim was not provided for in Coloney's plan; therefore, it was discharged upon confirmation pursuant to 11 U.S.C. § 1141(d)(1). The Court will enter a final judgment in accordance with these findings of fact and conclusions of law.