592 A.2d 47

**PHILADELPHIA HOUSING AUTHORITY, Appellant,**

v.

**Pearline BARBOUR, Appellee.**

**PHILADELPHIA HOUSING AUTHORITY, Appellee,**

v.

**Pearline BARBOUR, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 7, 1990.

Filed May 2, 1991.

Reargument Denied July 2, 1991.

Petition for Allowance of Appeal Granted
Oct. 7, 1991.

Denise J. Baker, Philadelphia, for appellant (at 1060) and appellee (at 1314).

Michael T. Donahue, Philadelphia, for appellant (at 1314) and appellee (at 1060).

Before WIEAND, KELLY and CERCONE, JJ.

WIEAND, Judge:

The issue in this appeal is whether a "Homebuyers Ownership Opportunity Agreement" under the federal Turnkey III housing program is a lease (with an option to buy) or a

long term sales agreement. The trial court held that it was a real estate sales agreement which precluded an eviction for nonpayment of rent without prior compliance with the notice requirements of state foreclosure proceedings, as contained in the Act of January 30, 1974, P.L. 13, No. 6, § 101 et seq., as amended, 41 P.S. § 101 et seq. and the Act of December 23, 1983, P.L. 385, No. 91, § 2, as amended, 35 P.S. § 1680.401c. We reverse.

Pearline Barbour entered a "Homebuyers Ownership Opportunity Agreement" with Philadelphia Housing Authority (PHA) on April 13, 1981. Pursuant thereto, Barbour took possession of a home under a HUD sponsored housing program known as "Turnkey III." This program has been described by the Court of Appeals for the Third Circuit as follows:

> The Turnkey III housing program is a federal program designed to provide home ownership opportunities for low income families. It is funded through the United States Department of Housing and Urban Development (HUD) and is subject to detailed federal regulation. These regulations cover virtually every aspect of the relationship between the tenants/purchasers and the landlord/seller— in this case the PHA as a HUD agent.
>
> The program works in the following manner. PHA acquires low rent housing developments with the financial assistance of HUD, and owns the homes until title is transferred to a homebuyer. PHA is responsible for the management of the program. To be eligible for the program, low income families must meet certain income guidelines. Once the PHA determines that a family is income eligible, the family is placed on a waiting list. The priority the family receives is determined by the PHA in accordance with HUD regulations. After a family is accepted into the program, but before the family may occupy a Turnkey III residence, the family must execute a Homebuyers Ownership Opportunity Agreement ("HOOA"). The HOOA is a contract between the occupant family ("homebuyer") and the PHA. The HOOA

specifies the obligations of the homebuyer and many of the obligations of the PHA.

The unique characteristic of this program is that participating residents in the program may, through the procedure described in the regulations, actually purchase their residences and become homeowners. The regulations provide two methods by which a homebuyer may purchase the home, both of which relate to his paying a percentage of his expenses into various HUD accounts; see 24 C.F.R. § 904.107.

*Ayers v. Philadelphia Housing Authority,* 908 F.2d 1184, 1185–1186 (3rd Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991) (footnotes omitted).

When Barbour failed to pay rent as agreed, PHA commenced an action seeking to recover possession and unpaid rent in the amount of five thousand, five hundred ($5,500) dollars in the Municipal Court of Philadelphia, as permitted by the Landlord and Tenant Act of 1951. See: 42 Pa.C.S. § 1123(a)(3). The Municipal Court held that the agreement between Barbour and PHA was a lease and that, therefore, it had jurisdiction to hear the action. The court then entered judgment in favor of PHA for possession of the premises and for rent in arrears. Barbour appealed to the Court of Common Pleas of Philadelphia, where PHA's action was dismissed. The court held that the agreement between the parties was a land purchase agreement and that, because PHA had failed to satisfy statutory notice requirements for foreclosure proceedings, the court lacked jurisdiction to hear the case. PHA appealed.

 When a party uses a preliminary objection in the nature of a petition raising a question of subject matter jurisdiction, the court's function is to determine whether the law will bar recovery due to the lack of such jurisdiction. See: *In re: Ordinance No. 1-9-86, Logan Township,* 116 Pa.Commw. 640, 542 A.2d 1051 (1988). The trial court, in this case, correctly held that the notice requirements pertaining to foreclosure proceedings are jurisdictional, and, where applicable, a failure to comply therewith will deprive

a court of jurisdiction to act. See: *Main Line Federal Savings and Loan Ass'n v. Joyce*, 632 F.Supp. 9 (E.D.Pa. 1986). Recently, however, the Court of Appeals for the Third Circuit, in *Ayers v. Philadelphia Housing Authority*, *supra*, held that the Pennsylvania statutes establishing procedures for evicting homeowners for failure to make mortgage payments have been preempted by federal regulations applicable to resident evictions in Turnkey III housing sponsored by the federal Department of Housing and Urban Development (HUD). Inasmuch as state notice requirements are inapplicable to evictions of Turnkey III housing occupants, therefore, the trial court erred when it dismissed the instant complaint for the PHA's failure to comply.[1] Our inquiry does not end, however, for we must now determine whether Barbour was properly evicted for nonpayment of rent by the Municipal Court under jurisdiction granted by the Landlord and Tenant Act of 1951.

▮ PHA contends that a Homebuyers Ownership Opportunity Agreement is nothing more than a lease with an option to buy. Unless and until the option to buy is exercised; therefore, the relationship between the parties is that of landlord and tenant. Jurisdiction over landlord and tenant actions is vested by statute in the Municipal Court of Philadelphia. Barbour argues, however, that the agreement is a contract to purchase real estate and that jurisdiction over disputes between buyer and seller is vested in the Court of Common Pleas.

As is true in other cases of written contracts, we look to the language of the agreement to ascertain the intention of the parties. *Cusamano v. Anthony M. DiLucia, Inc.*, 281 Pa.Super. 8, 13, 421 A.2d 1120, 1122 (1980). When we do so, we are constrained to agree with PHA that the parties' agreement, prior to exercise of the option to buy, is a lease.

The name of the agreement, "Homebuyers Ownership Opportunity Agreement", indicates precisely what is created: an ownership opportunity. The language used

1. Because the state statutes are inapplicable to the instant action, they do not support Barbour's claim for counsel fees.

throughout this agreement, however, suggests an intent to create a lease agreement. The very first provision reveals the nature of the contract, for it provides: "[i]n consideration of the agreements and covenants contained in this agreement and in the Homebuyers Ownership Opportunity Agreement Part II, ... the Authority hereby *leases* to the Homebuyer the following described land ..." (emphasis added). The agreement grants the lessee an option to purchase the home only upon the satisfaction of certain conditions. Meanwhile, the occupant is required to make monthly payments, referred to as "lease-rental" payments, which may increase or decrease according to changes in the "rent" schedule. Part II of the agreement explains that the home is "for occupancy by low-income families under lease-purchase agreements, each in the form of the Homebuyers Ownership Opportunity Agreement." It also recites that until the occupant satisfies the conditions precedent to exercising the option, he or she shall have the status of a lessee of the PHA. Although the tenant is referred to as a "homebuyer," such is defined as "member or members of a low-income family who have executed a Homebuyers Ownership Opportunity Agreement with the Authority." The agreement specifies that the name "also refers to the occupant during his status as lessee." A "homebuyer" is distinguished from a "homeowner" in the agreement in that a homeowner is "a homebuyer who has acquired title to his home." The terms "lease" and "option" in this case do not disguise a sales agreement. On the contrary, they clearly indicate the parties' intent that the agreement shall create a landlord and tenant relationship until such time as the option to purchase is exercised.

An agreement may be a lease, so as to create at first the relation of lessor and lessee, and also an executory contract of sale on certain conditions, and a lease may contain a provision giving the lessee an option to purchase the property during or at the end of the period specified therein.

51C C.J.S. Landlord and Tenant § 202(8) (1968). A lease with an option to purchase has been defined as "[a] lease under which the lessee has the right to purchase the property. The price and terms of the purchase must be set forth for the option to be valid. The option may run for the length of the lease period." Black's Law Dictionary 801 (5th ed. 1979).

■ "An option is not a sale, but is a right of election in the party taking the same to exercise a privilege, and only when that privilege has been exercised by acceptance in the manner specified in the agreement does it become an absolute contract binding upon both parties." 32 P.L.E. Options § 11 (1977). See also: *Biggins v. Shore*, 365 Pa.Super. 237, 529 A.2d 487 (1987) (an option is an offer which, when accepted, is a valid and binding contract), *aff'd*, 523 Pa. 148, 565 A.2d 737 (1989). When a lessee of real property exercises an option to purchase contained in the lease, it is then that the landlord and tenant relationship between the parties ceases to exist and the lease is converted into a contract of sale. *Detwiler v. Capone*, 357 Pa. 495, 55 A.2d 380 (1947).

With regards to a lease, the Supreme Court has said:

It is difficult to define a lease in terms which will fit all modern conditions; it may, we believe, be accurately defined as a conveyance or grant or demise of certain described land or tenement (usually in consideration of rent or other recompense) for a prescribed period or at will, but for a less time than the lessor hath in the premises: ....

"... no particular form of words is necessary to constitute a lease and ... any writing is sufficient which establishes the intention of one party voluntarily to dispossess himself of the premises, for a consideration, and of the other to assume the possession for a prescribed period: ...."

*Morrisville Shopping Center, Inc. v. Sun Ray Drug Co.*, 381 Pa. 576, 582, 112 A.2d 183, 186 (1955) (citations omitted). See also: *Ottman v. Albert Co.*, 327 Pa. 49, 54, 192 A. 897,

899–900 (1937) (lease, not sale occurs when use and possession pass, but not title).

Instantly, the agreement grants the homebuyer the right to use and possess the home in consideration of monthly payments, maintenance, and repair of the premises for a prescribed period of thirty (30) years. At the end of this period, if the homebuyer has not exercised the option to purchase, the home reverts to the PHA. The agreement clearly expresses PHA's intent to deliver possession of the home and the homebuyer's intent to possess the home for the prescribed period, with an option that the period may be decreased by purchase of the home.

In order for the homebuyer to be eligible to exercise the option, he or she must have: (1) achieved a certain balance in his or her Earned Home Payments Account within the first two years; (2) met the requirements of the agreement; and (3) rendered satisfactory performance of responsibilities owed to the Homebuyers Association. Even after satisfying these conditions, the homebuyer is still required to pay the applicable purchase price in order to exercise the option to purchase. Unless and until the homebuyer satisfies the conditions and pays the purchase price, the offer to sell has not been accepted and the relationship can only be characterized as that of landlord and tenant.

In the meantime, the agreement requires the homebuyer to make monthly payments and maintain and repair the home. The lease continues from month to month with automatic extensions for a period of thirty years. PHA may not freely terminate the agreement but must comply with regulations prescribed by HUD. Nowhere in the agreement, however, does the homebuyer promise or agree to purchase the home. His or her obligation is to occupy the premises and make monthly payments as prescribed by the agreement. If these payments are made and other conditions are met, then the occupant may, upon payment of an agreed price, purchase the home. Although PHA is then required to sell, the homebuyer is not only not required to

purchase but may terminate the agreement at any time upon thirty (30) days' notice.

The monthly payments required to be made by the occupant cannot be applied directly to satisfaction of the purchase price. These payments are based on the homebuyer's income. They are used to cover two costs: the debt-service cost and the "break even" cost. The debt-service cost covers PHA's payment on principal and interest. The "break even" cost is comprised of three amounts which are necessary to prevent PHA from operating at a loss. They include: (1) the monthly operating expenses of PHA; (2) the estimated monthly maintenance cost for the home; and (3) the estimated monthly non-routine maintenance cost for the home. From each monthly payment, the homebuyer has credited to his or her Earned Home Payment Account (EHPA) the estimated monthly cost for maintaining the home. Since the agreement requires the homebuyer to maintain and repair the home to the satisfaction of PHA, the homebuyer is, in effect, earning the credit. The EHPA also acts as a security account for PHA, because in the event the homebuyer fails to maintain or repair the premises, PHA may use the funds from the homebuyer's account to fulfill the occupant's neglected obligations. If the agreement is terminated or the homebuyer vacates the home, he or she may remove any remaining funds from the EHPA, for they are funds which have been earned through the program. Upon satisfaction of the conditions precedent to exercising the option to purchase, the homebuyer may also apply the funds in the EHPA account towards the price of the home.

An amount estimated for non-routine maintenance is credited to the homebuyer's Non–Routine Maintenance Reserve account. This account is created for the benefit of the home. If the agreement is terminated or the homebuyer vacates the home, the homebuyer is not entitled to the funds in the Non–Routine Maintenance Reserve account. However, if the homebuyer opts to purchase the home, any

balance remaining in this account is paid to the homebuyer at settlement.

A careful analysis of the Homebuyer's Ownership Opportunity Agreement makes it clear, we conclude, that the agreement is in reality a lease with an option to purchase. In the instant case, the option to purchase had not been exercised when PHA started an action to evict Barbour. The relationship between the parties, therefore, was that of landlord and tenant. As such, the action was governed by the Landlord and Tenant Act of 1951 and was properly brought in the Municipal Court of Philadelphia.

The order of the Court of Common Pleas is reversed and set aside, and the order of the Municipal Court is reinstated.