In re The LESLIE FAY COMPANIES, INC., Debtor.

The LESLIE FAY COMPANIES, INC., Plaintiff,

v.

CORPORATE PROPERTY ASSOCIATES 3, Defendant.

Bankruptcy No. 93–41724 (TLB).
Adv. No. 93–9151A.

United States Bankruptcy Court, S.D. New York.

April 21, 1994.

As Corrected April 22, 1994.

Weil, Gotshal & Manges by Corinne Ball, Erica Ryland and Josh Krevitt, Parker Chapin Flattau & Klimpl by Joel Lewittes and Barry Brett, Special Counsel, New York City, for debtor.

Willkie Farr & Gallagher by Alan Lipkin, New York City, Reed Smith Shaw & McClay by Robert Nicholas, Philadelphia, PA, for defendant.

Stroock Stroock & Lavan by Fred Hodara, New York City, for Official Committee of Unsecured Creditors.

## OPINION ON MOTION TO DISMISS

TINA L. BROZMAN, Bankruptcy Judge.

At issue is whether the Bankruptcy Code's cap on the damages which a landlord may receive when its lease is terminated applies to limit the damages from the debtor's breach, not of the lease, but of an exercised purchase option contained in the lease. The Leslie Fay Companies, Inc. ("Leslie Fay"), a chapter 11 debtor in possession, sued Corporate Property Associates 3 ("CPA 3"), seeking, in the first claim for relief, the turnover of a prepetition payment made by Leslie Fay to CPA 3 pursuant to a state court order. CPA 3 asked me to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), made applicable to the adversary proceeding by virtue of Fed.R.Bankr.P. 7012. At the conclusion of oral argument, I denied the motion insofar as it sought to dismiss the second claim for relief, but reserved decision with respect to the first, with which this decision deals.

### I.

In April 1982, Leslie Fay's predecessor in interest and CPA 3 entered into a "sale-leaseback" agreement pursuant to which the predecessor in interest sold certain nonresidential property in Plains Township, Pennsylvania (the "Premises") to CPA 3 and then leased the property back under a 25 year lease. *See* Complaint ¶¶ 14 and 16. As part and parcel of the lease, CPA 3 also gave Leslie Fay's predecessor an option to purchase the Premises at the end of the tenth year of the lease for a price equal to the greater of $9.4 million or the fair market value of the Premises. *See* Compl. ¶ 19. On October 8, 1991, Leslie Fay exercised the option as of April 30, 1992.[1] *See* Compl. ¶ 25. Leslie Fay tendered to CPA 3 $9.4 million. *See* Compl. ¶¶ 22 and 23. CPA 3 rejected the tender on the theory that the fair market value of the Premises exceeded $9.4 million. *See* Compl. ¶¶ 23 and 24.

Its tender rejected, Leslie Fay sued CPA 3 in the Pennsylvania Court of Common Pleas seeking an interpretation of terms in the agreement which would ultimately determine the purchase price under the option. *See* Compl. ¶ 28. That suit was dismissed and the dismissal was affirmed on appeal. *See* Compl. ¶ 28. After the trial court's decision but before the appeal was decided, Leslie Fay commenced a second action in Pennsylvania seeking to compel CPA 3 to transfer legal title to the Premises. Compl. ¶ 29. On June 11, 1992 the Pennsylvania Court of Common Pleas entered an order pursuant to a stipulation of the parties (the "June 11 Order"). Although this Order effectively denied Leslie Fay's request for immediate specific performance, it provided interim relief until the purchase were completed. *See* Compl. ¶ 29. Recounting its version of the "relevant part" of the June 11 Order, Leslie Fay acknowledges in the complaint that Leslie Fay was directed to both pay CPA 3 $7.2 million as a deposit against the purchase price of the Premises and also post a $15 million surety bond to secure payment of the balance. *See* Compl. ¶ 29. However, the June 11 Order also provided that the lease would remain in force until the purchase price were determined and that all interim payments of rent would be credited against the purchase price. *See* Compl. ¶ 29. Additionally, interest at an annual rate of 12% was to accrue on the purchase price in excess of $7.2 million and on the monthly rental payments made by Leslie Fay to CPA 3. *See* Compl. ¶ 29.

On April 5, 1993, Leslie Fay filed a voluntary chapter 11 petition which stayed all ongoing proceedings in Pennsylvania. As of the date of the filing of the petition, pursuant to the stipulation embodied in the June 11 Order, the lease was in full force and effect and there were no defaults in rent. *See* Compl. ¶¶ 34 and 44. Right on the heels of the bankruptcy filing, CPA 3 moved to lift the automatic stay. It sought to commence an arbitration proceeding to determine the fair market value of the Premises so as to

---

1. CPA 3 appended to its motion to dismiss the letter sent by Leslie Fay ("the Option Exercise") which unequivocally exercised the option to purchase the premises. That letter reads, "[Leslie Fay], as the holder by assignment of the tenant's interest in the above-referenced lease ("the Lease") hereby notifies you [CPA 3], pursuant to Paragraph 27 of the lease, of its exercise of its option to purchase the Leased Premises as defined in and under the lease." *See* Hirsch Aff., Ex. E.

enable CPA 3 to recover the remaining balance of the purchase price from the surety bond. Compl. ¶ 31. I denied CPA 3's motion, directed Leslie Fay to commence an adversary proceeding to sort out the parties' respective rights and ordered Leslie Fay to continue to pay rent under the lease pending my further order. *See* Compl. ¶ 32.

Leslie Fay never moved to assume or reject the lease nor to extend its time to do so. Thus, it now argues that on June 4, 1993, sixty days after the petition was filed, the lease was deemed rejected by operation of law.[2] *See* Compl. ¶ 36. The record does not indicate when, if ever, Leslie Fay surrendered the Premises to CPA 3; nor does it specify what action, if any, CPA 3 has taken to mitigate any damages which it may claim to have suffered.

In June 1993, Leslie Fay commenced this adversary proceeding seeking to recover the bulk of the monies paid to CPA 3 pursuant to the June 11 Order. Leslie Fay filed an amended complaint on February 8, 1994; nevertheless, the parties have asked that I decide CPA 3's motion to dismiss without reference to the amended complaint. The first claim for relief (which is all that this decision addresses) pleads that any claim of CPA 3 is limited to $4.5 million pursuant to 11 U.S.C. § 502(b)(6). If the legal theory is correct, then Leslie Fay is said to be entitled to the immediate return of that portion of the cash deposit of $7.2 million, plus interest thereon, which exceeds the maximum $4.5 million allowable amount of CPA 3's claim. *See* Compl. ¶ 43. Accordingly, Leslie Fay seeks the turnover of the remaining $2.7 million plus interest thereon at a rate of 12%. *See* Compl. ¶¶ 45–46. As noted earlier, CPA 3 urges that this portion of the complaint fails to state a claim for which relief could be granted.

**II.**

The ultimate issue here is whether CPA 3 can be compelled on the facts stated in the complaint's first claim for relief to turn over some or all of the $7.2 million transferred to it prepetition. Subsumed in this question is whether the damages resulting from an alleged breach of the option is limited by section 502(b)(6)[3] or any other provision of the Bankruptcy Code. Leslie Fay argues that because the option is "inextricably intertwined" with and not severable from the lease, any resulting damages from a breach effectively arise under the lease and are capped by section 502(b)(6). Leslie Fay also argues that even if the option is a severable agreement, section 502(b)(6) applies because the purchase price, and, *ipso facto* the measure of damages, is "almost entirely comprised of future rent payments." Thus, the argument follows, the option itself was nothing more than an alternative mechanism for the collection of future rent which renders the $7.2 million payment equal to a rental security deposit and subject to the limitation on damages payable to a landlord from the debtor's breach of the landlord's lease. As a final twist, Leslie Fay argues that, even if its theory is incorrect, I must deny the requested relief because I am bound, for purposes of this motion, to accept Leslie Fay's characterization of the purchase price, and, therefore, the $7.2 million installment payment thereon, as prepaid rent. If one accepts the proposition that the $7.2 million is prepaid rent, then even CPA 3 would admit that the complaint is facially sufficient. (CPA 3 quarrels, however, with the notion that I must accept as true Leslie Fay's interpretation of the nature of the purchase price.) Leslie Fay continues along this procedural path by objecting to my consideration of any of the supporting documents appended to CPA 3's motion.

---

2. By virtue of Leslie Fay's second claim for relief, the parties argue over whether their relationship is one of lessor/lessee or secured lender/borrower. If the lease is just that, Leslie Fay claims it is deemed rejected by operation of law as of June 4, 1993 (the 60th day after the petition was filed). *See* Comp. ¶ 36. If the transaction is a secured financing, then Section 365 of the Bankruptcy Code would be inapplicable. This issue cannot be resolved on this motion.

3. 11 U.S.C. § 502(b)(6) provides in pertinent part that a landlord's claim for damages shall not be allowed to the extent "such claim exceeds—(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease ... plus (B) any unpaid rent due under such lease, without acceleration ..."

CPA 3, on the other hand, contends that the option is an independent and severable agreement which was irrevocably exercised, pursuant to the October 8, 1991 letter, nearly 18 months prior to the filing of the petition. Thus, CPA 3 argues, any damages suffered arise as a result of a breach in the execution of the sale of the Premises and section 502(b)(6) does not apply. Further, CPA 3 disputes Leslie Fay's contention that the $7.2 million is tantamount to a security deposit for rent, pointing me instead to the June 11 Order which deemed this sum to be "partial payment on account of the purchase price." In light of this Order, CPA 3 asserts, there is no basis for Leslie Fay's bald conclusion that these monies constitute prepaid rent which is subject to the limitations of section 502(b)(6). CPA 3 also argues that turnover is not warranted since "[u]nder Pennsylvania law, which governs here, the partial payments are not Leslie Fay's property because a breaching buyer has no right to recover payments made in partial performance of a real property purchase agreement." *See* Repl.Br. at 27. As for the procedural challenges mounted by Leslie Fay, CPA 3 points me to authority in this Circuit which it believes allows a court to go beyond the four corners of the pleadings in ruling on a motion to dismiss.

### III.

#### A. *Fed.R.Civ.P. 12(b)(6)*

In support of its motion, CPA 3 appends, among other things, the lease, the June 11 Order and the Option Exercise. *See* Hirsch Aff., Exs. C, E, and G. Leslie Fay objects to my considering these exhibits for any purpose other than to indicate their existence. The purpose of a motion to dismiss, Leslie Fay argues, is not to evaluate the merits of the cause of action but rather to determine the sufficiency of the complaint. Thus, the argument follows, I must accept as true all the allegations in its complaint, including the conclusion that the funds represent prepaid rent, and deny the motion to dismiss.

■ A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) may be granted only where it appears beyond a reasonable doubt that no set of facts could be proven at trial that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S.

41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citing *Conley,* 355 U.S. 41, 78 S.Ct. 99); *Kolinsky v. Russ (In re Kolinsky),* 100 B.R. 695, 705 (S.D.N.Y.1989). On a motion to dismiss, a court must read the complaint generously and make all reasonable inferences in favor of the non-moving party. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *See Raine v. Lorimar Prod. Inc.,* 71 B.R. 450, 453 (S.D.N.Y.1987); 2A J. Moore, *Moore's Federal Practice,* ¶ 12.07[2.–5] at 12–84 (2d ed. 1993). The court's function is not to weigh the evidence that might be presented at a trial, but merely to determine whether the complaint itself is legally sufficient. *Festa v. Local 3, Int'l Brotherhood of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990). In assessing the sufficiency of the complaint, courts must accept as true the factual allegations contained in the complaint. *Id.* This is not to say, however, that every statement in a complaint must be accepted as true. "The allegations of a complaint must be 'well pleaded' and thus the court need not accept 'sweeping and unwarranted averments of fact.'" *Perniciaro v. Natale (In re Natale),* 136 B.R. 344, 348 (Bankr.E.D.N.Y.1992) (quoting *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987)), *see e.g., Homan Mfg. Co. v. Russo,* 233 F.2d 547, 550 (7th Cir.1956) (citations omitted) ("allegations . . . are not well pleaded facts unless they constitute reasonable inferences from specific facts otherwise set forth"); *Johnson v. Wells,* 566 F.2d 1016, 1017 (5th Cir.1978) (mere statement in a complaint is not sufficient to state a claim upon which relief can be granted under 42 U.S.C. § 1983). In addition, courts are free to disregard legal conclusions, deductions or opinions couched as factual allegations. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 311–18 (2d ed. 1990); 2A James Wm. Moore et al., Moore's Federal Practice ¶ 12.07[2–5] at 12–84 to 12–85 (2d ed. 1993).

■ As the Second Circuit recently explained, when determining the sufficiency of the complaint for rule 12(b)(6) purposes, the court's consideration is limited to the factual allegations in the complaint, to documents attached to the complaint as exhibits, or in-

corporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied sub nom.,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994) (on a motion to dismiss, court may consider allegations contained in the complaint, exhibits attached to the complaint, matters of public record and certain indisputably authentic documents); *see also Chan v. City of New York,* 1 F.3d 96, 98 (2d Cir.), *cert. denied sub nom.,* —— U.S. ——, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993).

■ There can be little doubt that I am permitted to consider the three challenged documents in deciding this motion. Although Leslie Fay did not annex as exhibits to its complaint any of the lease, the June 11 Order or the Option Exercise [4], all three were referred to therein and Leslie Fay relied on them in bringing suit. *See* Compl. ¶¶ 16, 19, 25 and 29. *See e.g., National Ass'n of Pharmaceutical Mfr., Inc. v. Ayerst Lab.,* 850 F.2d 904, 910 n. 3 (2d Cir.1988). Moreover, I certainly can take judicial notice of the June 11 Order since it is a matter of public record. To strike these concededly authentic documents from consideration, notwithstanding Leslie Fay's reliance on and referral to them, might allow Leslie Fay to survive a motion to dismiss with a legally deficient claim simply because it failed to attach dispositive documents to its complaint. *See White Consol. Indus.,* 998 F.2d at 1196; *Cortec,* 949 F.2d at 47. That would be contrary to fundamental notions of fair play.

**B.** *11 U.S.C. § 365 and § 502(b)(6) Generally*

■ Section 365 of the Bankruptcy Code provides in pertinent part that the trustee, subject to court approval, may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). If an executory contract is assumed, it is said to be assumed *cum onere,* with all of its benefits and burdens. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). An executory contract can not be assumed in part and rejected in part. *In re PCH Assoc.,* 804 F.2d 193, 199 (2d Cir.1986); *In re Village Rathskellar, Inc.,* 147 B.R. 665, 671 (Bankr.S.D.N.Y.1992); *but cf. In re McLean Indus.,* 132 B.R. 247, 265 (Bankr.S.D.N.Y.1991), *aff'd,* 162 B.R. 410 (S.D.N.Y.1993) (separate agreement of assignment which constituted a preferential transfer and which was incorporated in validly assumed contract was not assumed when contract was assumed).

■ Ordinarily, pursuant to section 365(d)(2), the debtor is not required to assume or reject an executory contract prior to the hearing on confirmation of a plan. *In re Public Serv. Co. of New Hampshire,* 884 F.2d 11, 14 (1st Cir.1989). In the meantime, the executory contract remains in effect and nondebtor contracting parties are bound to honor it. If and when assumed, the contract operates according to its tenor. On the other hand, eventual rejection "constitutes a breach of such contract," and the breach in accord with what has been termed the "relation back" doctrine is treated as if it had occurred prepetition...." *Id.* (quoting 11 U.S.C. § 365(g)).

■ It is well settled that a creditor is generally entitled to assert a prepetition claim for damages resulting from a debtor's breach of a contract. *See* 11 U.S.C. § 365(g)(1); *In re Ionosphere Clubs, Inc.,* 124 B.R. 635, 639 (S.D.N.Y.1991). In a few instances, however, Congress has established limits on the amount a creditor may claim. *See* 11 U.S.C. § 502(b). Section 502(b)(6) is such an example; it caps the claim that a landlord may assert for damages resulting from the termination of a lease of real property. 11 U.S.C. § 502(b)(6); *PCH Assoc.,* 804 F.2d at 199. This provision, which is grounded in principles of ratable distribution, balances the interests of landlords against those of other creditors by preventing landlords from receiving a windfall as a result of the filing of the bankruptcy petition. *Id.; In re Farley, Inc.,* 146 B.R. 739, 744–745

---

**4.** These are the only documents which I have considered among the sheaf submitted by CPA 3.

(Bankr.N.D.Ill.1992). "Section 502(b)(6) was designed to compensate a landlord for the loss suffered upon termination but at the same time limit the recovery to a reasonable amount that would not prevent other creditors from recovering from the estate." *In re Bob's Sea Ray Boats, Inc.,* 143 B.R. 229, 231 (Bankr.D.N.D.1992) (citing H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6309.); *see also Farley, Inc.,* 146 B.R. at 744–745 (citing *Oldden v. Tonto Realty Corp.,* 143 F.2d 916, 920 (2d Cir.1944); S.Rep. 95–989, 95th Cong., 2nd Sess. 63, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849)); *In re Revco D.S., Inc.,* 138 B.R. 528, 531 (Bankr.N.D.Ohio 1991); *In re Rodman,* 60 B.R. 334, 335 (Bankr.W.D.Okla.1986). As several courts have recognized:

> permitting a landlord to consume a substantial part of the property for his benefit is unfair in light of the fact that the landlord has the opportunity to mitigate his damages by reletting. Not only has the landlord been compensated up until the date of the bankruptcy petition but also reacquires his original assets upon bankruptcy.

*Farley,* 146 B.R. at 745, (quoting *In re Thompson,* 116 B.R. 610, 613 (Bankr. S.D.Ohio 1990)), *accord Rodman,* 60 B.R. at 335 (citing *Oldden* ).

### C. *The Security Deposit Theory*

 Leslie Fay argues that it is entitled to turnover because the $7.2 million is tantamount to a security deposit. I must conclude that this is so, says Leslie Fay, because I cannot look at the June 11 Order. I do not agree. Although for purposes of this motion, I am required to accept the factual allegations in the complaint as true, I am free to disregard sweeping and unwarranted averments of fact, such as the label given to this transfer. *See e.g., Developer's Morg. Co. v. TransOhio Sav. Bank,* 706 F.Supp. 570, 573 (S.D.Ohio 1989) ("label given to the instrument is simply not dispositive of its status as a security"); *Wayne H. Coloney Co. v. United States Dep't of Air Force,* 89 B.R. 924, 933 (Bankr.N.D.Fla.1988) (citing *Ram Constr. Co. v. American States Ins. Co.,* 749 F.2d 1049, 1052 (3d Cir.1984)). The June 11 Order sets forth that the $7.2 million transfer represents a payment on account of the sale price and is not ambiguous on this point; accordingly its interpretation would not represent an issue of fact. *See Ram Constr. Co.,* 749 F.2d at 1052 (in contract interpretation, when an agreement is in writing, ambiguous terms are interpreted by the jury while unambiguous ones are interpreted by the court). Moreover, the option price set forth in the lease is not limited to the discounted value of the rental stream, as Leslie Fay urges. Rather, as paragraph 19 of Leslie Fay's complaint states, the purchase price was to be equal to the greater of $9.4 million or the fair market value of the Premises. "Fair market value" was defined as "the value of the Leased Premises as impacted by this Lease." *See* ¶ 27 of the lease and ¶ 27 of the complaint. Significantly, the definition of fair market value in the option does not state that that value is equal simply to the discounted rental stream. Since it was conceivable that because of market conditions like a drop in the interest rate, inflation, or other similar factors the Premises could appreciate in value to a sum far in excess of the discounted value of the rental stream at the time the parties executed the lease, Leslie Fay's characterization of the purchase price (and the $7.2 million) makes no sense at all, even without looking at *any* document other than the complaint itself.

What Leslie Fay has ignored is that the value of real estate is not equal to the discounted value of the cash flow over a fixed (usually ten year) term. That calculation is a major component of value under the income approach to valuation. But, in addition, an appraiser must factor in the residual value of the property after the expiration of the selected income period. *See The Appraisal of Real Estate,* American Inst. of Real Estate Appraisers, at 413, 415 and 420 (10th ed. 1992). The residual value can be calculated separately or as part of the interest rate used to derive the capitalization ratio, but the residual must be included to arrive at value. *Id.* at 414, 416–417, 421. Thus, it is simply impossible to draw the inference which Leslie Fay says flows from the facts which it has pleaded, that the fair market value of the Premises is nothing more than the discounted rental stream. The state court got it right. The $7.2 million does not constitute

prepaid rent but represents a deposit in the context of a contemplated sale of the Premises.

### D. The Application of 502(b)(6) to Purchase Options

We turn then to whether the inclusion of the exercised purchase option in a lease which is rejected subsequent to the exercise of the option somehow implicates the cap of section 502(b)(6) of the Code if the debtor breaches by refusing to close. Leslie Fay seems to argue, although not in so many words, that when it failed to assume the lease, it thereby rejected the option agreement. Whatever the merit of that position when an option has not been exercised, here there was an exercise many, many months in advance of the rejection of the lease. The transmittal of the Option Exercise terminated the option contract and gave rise to an independent land sale contract, separate and distinct from the underlying lease. *In re Maier*, 127 B.R. 325 (Bankr.W.D.N.Y.1991), (quoting *Farber Hempstead Corp. v. Buckley*, 65 Misc.2d 237, 317 N.Y.S.2d 30, 32 (D.Suffolk County 1970)) ("Upon accepting an option to buy contained in a lease, the option becomes a binding contract of sale and the tenant becomes a purchaser in possession."); *In re Hardie*, 100 B.R. 284, 287 (Bankr.E.D.N.C.1989) (quoting *Kidd v. Early*, 289 N.C. 343, 222 S.E.2d 392, 399 (1976) ("An option is not a contract to sell, but it is transformed into one upon acceptance by the optionee in accordance with its terms"); *Darrt Dev. Co. v. Tri–State Asphalt Corp.*, 415 Pa.Super. 239, 609 A.2d 171, 173 (1992), *appeal denied by*, 634 A.2d 1116 (1993); *Philadelphia Hous. Auth. v. Barbour*, 405 Pa.Super. 140, 592 A.2d 47, 49 (Pa.Super.Ct.1991), *aff'd*, 615 A.2d 339 (1992).

Assuming without deciding that Leslie Fay is able to reject the land sales contract,[5] it follows that damages arising from a breach of the exercised purchase option would not be capped by section 502(b)(6) of the Bankruptcy Code. *See In re Waldron*, 36 B.R. 633, 641–642 (Bankr.S.D.Fla.1984), *rev'd on other grounds*, 785 F.2d 936 (11th Cir.), *cert. dismissed*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986). Section 502(b)(6) does not purport to place a limit on damages arising from a breach of a transaction involving the sale of real property. *International Trade Administration v. Rensselaer Polytechnic Institute*, 936 F.2d 744, 750 (2d Cir. 1991) (citing *PCH Assoc.*, 804 F.2d at 199.) If Congress had intended to limit the amount of a claim for breach of a contract for the sale of real property, it would have provided so expressly, most probably by including another subsection in 502(b). *See Waldron*, 36 B.R. at 641–642. But Congress chose not to do so. The conclusion is inescapable that 502(b)(6) does not cap damages from the termination of a sale of real property notwithstanding that the contract arose from the exercise of an option contained in a lease.[6]

I am not persuaded otherwise by the cases cited in Leslie Fay's brief which extend the reach of section 502(b)(6) to the claims of third party guarantors. *See Matter of Interco, Inc.*, 149 B.R. 934, 941 (Bankr.E.D.Mo. 1993); *Farley*, 146 B.R. at 745; *Revco*, 138 B.R. at 531; *Thompson*, 116 B.R. at 613; *Rodman*, 60 B.R. at 335, *but see In re Danrik*, 92 B.R. 964 (Bankr.N.D.Ga.1988). In

---

5. In a footnote, CPA acknowledges that "[a] chapter 11 debtor does have the right under section 365 to reject an executory contract containing an option to purchase real property." *See* Memorandum in Support of Motion at 26 n. 18 (citing *Sundial Asphalt Co. v. VPC Investors Corp.*, 147 B.R. 72 (E.D.N.Y.1992)); *but see In re Rehbein*, 60 B.R. 436, 441 n. 6 (9th Cir. BAP 1986) (stating in dicta that an exercised option contract is not subject to rejection). In *Sundial*, District Judge Spatt held that a land sale contract which arose via an exercise of an option could be rejected where the "[t]he buyer still [had] to pay the remainder of the purchase price and the seller [had] to give up possession and convey title." *Sundial*, 147 B.R. at 80. Here, not only are those circumstances present, but

there is an unresolved dispute as to the sale price of the Premises. Thus, although I stop short of ruling on the ability of Leslie Fay to reject the land sale contract, I note the appeal of the decision in *Sundial*. Down the road, the parties will have the opportunity to further brief the issue of whether Leslie Fay still can reject the contract and whether it is in the best interest of the estate for Leslie Fay to do so.

6. As stated earlier, Leslie Fay's argument that the purchase price is nothing more than the discounted value of the rental stream is not correct. With this foundation gone, Leslie Fay's inventive theory that the cap on damages should apply to a rental stream masquerading as a purchase price falls as well.

those situations the creditor is secondarily liable on the underlying lease and therefore holds a contingent claim against the debtor for any amounts ultimately paid to the landlord on account of a breach. If the purview of section 502(b)(6) were not extended in such situations, the cost to the debtor of a breach of the lease effectively would not be limited. This is exactly the mischief Congress intended to avoid when it enacted section 502(b)(6).

### E. The Propriety of Turnover

All the foregoing does not lead inexorably, however, to the conclusion that the turnover claim must be dismissed, for I am unable to conclude that there is no set of facts which can be established at trial which would subject CPA 3 to a valid turnover demand. See National Org. for Women, Inc. v. Scheidler, —— U.S. ——, ——, 114 S.Ct. 798, 800, 127 L.Ed.2d 99 (1994) ("Complaint must be sustained if relief could be granted under any set of facts that could be proved consistent with the allegations.").

Leslie Fay is apparently under the impression, with which I disagree, that the option was rejected when the lease was rejected (assuming that the lease is a true lease) under 11 U.S.C. § 365(d)(4). The option was exercised prior to rejection. It may be, however, that Leslie Fay would want to reject the contract to purchase the Premises for the greater of $9.4 million or their fair market value. If Leslie Fay is still able and desires to reject the land sale contract, CPA 3 would be entitled to assert an uncapped claim for damages sustained from rejection of this contract as calculated under Pennsylvania law. Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law."); see also Trachtenburg v. Sibarco Stations, Inc., 477 Pa. 517, 384 A.2d 1209, 1212 (1978) (In Pennsylvania, a seller of real estate, upon a breach, generally can commence an action at law, an action for specific performance, and an assumpsit action.). Were CPA 3 to have a claim for damages from breach of the land sale con-

tract, it would be "measured as the contract price minus the fair market value at the time of the breach less any payments received." Id.; see also In re J.B. Van Sciver Co., 73 B.R. 838, 847 (Bankr.E.D.Pa.1987). At this time, I cannot determine what the contract price was since it was the fair market value at that time; nor does the record establish what the fair market value of the property was as of the date of the filing (which would be the date of the breach if the land sale contract were to be rejected) [7].

If it has not sustained the requisite damage, CPA 3 may have to return the excess, which would constitute property of the estate. CPA 3 suggests that if I agree that its claim from breach of the land sale contract is not capped, then under no circumstances could Leslie Fay be entitled to turnover. This flows, says CPA 3, from the common law in Pennsylvania that a breaching party to a land sale contract is not entitled to the return of any of the amounts paid on account of the sale. See Repl.Br. at 27 (citing Luria v. Robbins, 223 Pa.Super. 456, 302 A.2d 361, 366 (1973)).

Although it seems as though the Pennsylvania common law did permit forfeitures, I am not convinced that CPA 3's conclusion is entirely accurate. First off, I am not certain that the common law espoused in Luria is still the law of Pennsylvania in this area. See Lancellotti v. Thomas, 341 Pa.Super. 1, 491 A.2d 117, 121–122 (1985) (where court concluded that the Restatement (Second) of Contracts controlled whether a seller of a business was entitled to keep the entire deposit and suggested in dicta that "the common law rule is no longer intact even with respect to land sales contracts."). Second, other case law seems to limit Luria's holding by capping the damages allowable upon a buyers breach at a maximum of 15%. See Berwick v. Daniel W. Keuler Realtors, Inc., 407 Pa.Super. 528, 595 A.2d 1272, 1276 n. 1 (1991) (seller's retention of a 31% deposit would constitute an unenforceable penalty); In re Cremen, 34 B.R. 617, 619 (Bankr. M.D.Pa.1983) (citing Kraft v. Michael, 166

---

7. It is not inconceivable that in light of my conclusion that CPA 3's claim for damages from breach of the land sale contract would not be capped, Leslie Fay might decide not to breach that contract through rejection but to litigate the fair market value as of the time when it exercised the option to purchase.

Pa.Super. 57, 70 A.2d 424 (1950)). Under these circumstances, I am not prepared at this juncture to rule that CPA 3 would be entitled to keep the entire proceeds.[8]

Moreover, it is not appropriate to determine now whether and to what extent CPA 3 would be entitled to damages from breach of the lease occasioned by its rejection. Whereas a landlord ordinarily would be entitled to prove damages from rejection, here it is not clear what was intended. Although the stipulation of the parties contained in the June 11 Order continued the lease in effect until a completed purchase occurred, the stipulation also provided that the lease payments would bear interest and be applied in reduction of the purchase price. Arguably, then, CPA 3 gave up its right to damages from rejection by agreeing that it was entitled only to the purchase price or, in the event of Leslie Fay's failure to close, damages from the breach of the land sale contract.

For all the foregoing reasons, I am unable at this time to determine whether CPA 3 has suffered damage from a breach of this land sale contract, or the lease, which would allow it to keep any or all of the $7.2 million. Accordingly, CPA 3's motion to dismiss the first cause of action must be denied.

SETTLE ORDER consistent with this decision.

**In re Mark and Mary ROBINSON, Debtors.**

**Bankruptcy No. 93–10603.**

United States Bankruptcy Court, D. Vermont.

April 20, 1994.

M. Wieler, Harlow Liccardi & Crawford, P.C., Rutland, VT, for debtors.

C. Baril, Office of the U.S. Atty., Rutland, VT, for the I.R.S.

T. Collins, Vermont Dept. of Taxes, Montpelier, VT, for the Vermont Dept. of Taxes (Vermont).

**MEMORANDUM OF DECISION ON MOTION TO AVOID TAX LIENS UNDER 11 U.S.C. § 545(2)**

FRANCIS G. CONRAD, Bankruptcy Judge.

---

8. I am also unpersuaded by CPA 3's contention that "[r]ejection of the Agreement would not convert the partial payments into property of the estate." See Repl.Br. at 27. The cases CPA 3 cites correctly point out that "the rejection of an executory contract is not the equivalent of rescission." See In re Rudaw/Empirical Software Prod-

ucts, Ltd., 83 B.R. 241, 246 (Bankr.S.D.N.Y. 1988); In re Executive Technology Data Systems, 79 B.R. 276, 284 (Bankr.E.D.Mich.1987). The issue here, however, is not whether Leslie Fay may rescind. The issue is whether CPA 3 is entitled under Pennsylvania law to retain every-

## FACTS

thing that has been paid to it in the event that Leslie Fay determines not to complete the sale.